***********
The Full Commission is addressing only one limited issue on remand. The North Carolina Court of Appeals instructed the Full Commission to make its findings of fact consistent with its conclusions of law regarding the method of calculating the average weekly wages to be utilized in determining Plaintiff's weekly disability benefit payment under N.C. Gen. Stat. § 97-2(5). Based upon the competent evidence of record, the Full Commission amends its prior Opinion and Award as follows: *Page 2 
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. Plaintiff was employed by Defendant-Employer from on or about January 1, 1949 until January 1, 1950 and again from August 1, 1952 until August 31, 1968. Plaintiff-Employee's Social Security Earning Statement shows Plaintiff receiving wages from Defendant-Employer until June 1969. Plaintiff received severance payments from Defendant-Employer from September 1, 1968 through June 1969.
2. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
3. Defendant-Employer Johns Manville Products Corp. had workers' compensation insurance coverage with Defendant-Carrier, St. Paul Travelers, (or its predecessors), from 1963 through 7/1/69.
4. The following was stipulated into evidence at the hearing:
 a. Form 18B dated May 24, 2005;
 b. Form 61 dated November 11, 2005;
 c. Form 33 dated March 24, 2006;
 d. From 33R dated April 3, 2006;
 e. Defendants' Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents; *Page 3 
 f. Plaintiff's itemized Social Security statement of earnings;
 g. Plaintiff's medical records.
5. The following exhibits were admitted into evidence at the hearing:
 a. Plaintiff's #1, Form 61 in Billy Durham vs. Ray Co.;
 b. Plaintiff's #2, Form 61 in Norman Wright vs. Moretti Construction;
 c. Plaintiff's #3, picture of loom in weaving dept;
 d. Plaintiff's #4, picture of card in carding dept.
 ***********
Based on the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 80 years old. He completed high school in approximately 1946. The majority, if not all of his working career, has been spent in the manufacturing business or as a turkey farmer. As a result of breathing problems, Plaintiff stopped working in September 2003.
2. Plaintiff worked at a manufacturing facility located in Marshville, North Carolina, from 1949 to August 1968 continuously except for about 20 months from 1951 to 1952 when he went into military service. The facility initially was owned by the Union Asbestos and Rubber Company and later purchased by Johns Manville in 1962.
3. Initially, Plaintiff worked as a "spare hand" and did jobs throughout the facility. In 1957, he was promoted to supervisor of the entire yarn manufacturing department of the company. He held this job until he left the company in 1968. As a supervisor, Plaintiff would spend about 90 percent of his time on the plant floor checking the manufacturing process.
4. The facility where Plaintiff worked mixed raw asbestos fibers with either cotton or rayon to form asbestos yarn to be woven into cloth or tape. The raw asbestos would come into *Page 4 
the plant in 50-pound bags. The bags would be taken to the "preparation room" to be opened and mixed with either cotton or rayon. Once the asbestos was mixed, it would be taken to the "carding" room where the combined fibers would be pulled to align the fibers. At this point the fiber mixture would go to the spinning department where the fiber mixture would be spun into thin yarn. Next, this thin yarn is taken to the twisting department where these thin threads are twisted together to form a larger type yarn. Once this larger yarn is formed, it is taken to the weaving department where it is made into a cloth-type product.
5. In the preparation room, the workers would put the cotton fiber on the floor, then they would open a 50-pound bag of raw asbestos fibers and dump the fibers onto the cotton by hand and mix the two fibers together. The most common blend of cotton/rayon and asbestos they made was known as a "110 blend" and consisted of 90% asbestos fibers and 10% cotton fibers. This blending process created a lot of dust. During a shift, they would use approximately 30 50-pound bags of asbestos.
6. Once mixed, the fiber mixture would be brought into the carding department in a rolling box. Workers would use their hands and pick up the fibers by "armfuls" and load the fibers into the back of the card machine.
7. The card machines consisted of several rollers pulling the fiber mixture into long strands. There were 12 card machines operating at the same time each creating dust from the fiber mixture. Asbestos, a "short" fiber, would be pulled out of the mixture as it was processed in the rollers and create dust. Because of the different size rollers turning at various speeds pulling at the fiber mixture, a lot of dust was created.
8. The dust created by the card machines looked like dense fog or a snowstorm. Plaintiff indicated that the dust in the air was so bad you could not tell who a person was at the *Page 5 
opposite end of the room, 75 feet away. After spending time in the card room, the employees', including Plaintiff's, clothes would be covered with the asbestos fiber mixture.
9. After the asbestos mixture was processed in the card room, it would then be sent to the spinning room. The spinning process was done using high speed spindles twisting the carding product into thread. This process created dust all the time and the area would have to be cleaned 3 or 4 times a day.
10. From the spinning department, the thread went to the spooling department. The spooling process involved the spindles and spools turning at a very high rate of speed and this caused dust to come off the thread which caused the department to look foggy all the time.
11. Once the thread was placed on the larger spools, it was sent to the twisting room. In the twisting room, 120 spindles of thread were spun at a high speed and twisted into a larger thread. This process also created a lot of dust that came from the fiber.
12. Once the thread was twisted, the spindles were sent to the weave room to be made into fabric. In the weave room, the thread would be used in a loom. The loom would hold a number of threads next to one another and then a shuttle would run across these threads carrying another thread thereby "weaving" the threads together. This process, too, created a "fog" of dust.
13. Plaintiff explained in his testimony that all of the departments were contained in one large room with no separating walls and the dust would travel throughout the building, especially due to a dust system on the carding machines that would also move the air in the plant but not remove all the dust. As a supervisor, Plaintiff visited all of the plant's departments about 3-4 times a day. *Page 6 
14. Plaintiff did not use any breathing protection while working for Defendant-Employer.
15. Plaintiff's clothes were covered in a white film of dust at the end of the work day and he and the other workers in the building would use an air hose to blow their clothes off before going home. As the employees blew off their clothes, it would look like snow.
16. Greg Carpenter worked with Plaintiff at the plant in question and he was accepted as a corroborative witness for Plaintiff at the hearing without objection from Defendants.
17. Dr. Fred C. Umeh is board-certified in pulmonary, critical care, and general medicine. Dr. Umeh began treating Plaintiff in April 2004 on a referral from Plaintiff's family doctor, Dr. Gary Henry for chronic cough and lung problems.
18. Dr. Umeh opined that Plaintiff had sufficient exposure to asbestos and sufficient latency to contract asbestosis. After examining Plaintiff, Dr. Umeh found that Plaintiff had bilateral basilar rales which he attributed to asbestosis and asbestos exposure in his deposition:
 Q. I'm looking at the April 5th, 2004 note. You diagnosed bilateral basilar rales.
 R. Uh-huh (yes)
 Q. And what is the significance of those findings as it relates to someone with the disease of asbestosis?
 R. It does indicate — this is the most — probably the — a sign you have of pulmonary fibrosis. So it does indicate that you have interstitial lung disease because as the lungs pop open, they'll make that crackly, or what we call rales. And clinically it does support, you know, that he most likely had — that he had pulmonary fibrosis.
 Q. Okay. That's indicative of pulmonary fibrosis?
 R. Yes.
 Q. Which would be — one form of that would be asbestosis? *Page 7 
 R. Well, once we have pulmonary fibrosis with a clear historical — you know, history of exposure to asbestos, and also radiological evidence of, you know, asbestos, you know, a lung disease with fibrosis qualifies as asbestosis.
19. Plaintiff was given a pulmonary function test on April 5, 2004, which revealed a lung impairment of a moderate obstructive nature. However, subsequent pulmonary function tests done over time showed that Plaintiff also developed a pulmonary restriction. Dr. Umeh testified that the restrictive component of his lung impairment would be characteristic of someone with asbestosis.
20. After a review of Plaintiff's CT scans, Dr. Umeh diagnosed Plaintiff with asbestosis and asbestos-related calcified pleural plaques. He testified to a reasonable degree of medical certainty that Plaintiff has asbestosis.
21. As a result of his conditions, Plaintiff currently is required to use oxygen 24 hours a day and, even while using oxygen, his oxygen level drops with any type of physical activity. Dr. Umeh opined that Plaintiff's asbestosis plays a significant role in his breathing problems. Dr. Umeh further stated that he does not believe Plaintiff would be able to do any type of physical work. At the time of the hearing, Plaintiff saw Dr. Umeh about every three months.
22. Dr. Robyn Stacy-Humphries is a staff radiologist at Union Regional Medical Center. She reviewed the various forms of radiology taken of Plaintiff. She found calcified pleural plaques which she testified were caused by asbestos exposure. She also testified that in 1999, she found signs of chronic interstitial lung disease and by 2005, she found linear scarring or fibrosis in Plaintiff's lungs. One of the possible causes of such conditions is asbestosis.
23. Dr. John Adams, like Dr. Stacy-Humphries, is a staff radiologist at Union Regional Medical Center. Dr. Adams also found linear opacities on Plaintiff's radiology, which *Page 8 
he said could be caused by asbestosis. Dr. Adams also opined that the pleural plaques seen on Plaintiff's radiology showed asbestos exposure.
24. Dr. Kunstling was retained by Defendants. Dr. Kunstling agreed that Plaintiff had sufficient exposure to asbestos to develop asbestosis and that he had a sufficient latency to develop asbestosis. Dr. Kunstling found that Mr. Pope suffered from "rales" in the bases of his lungs as well as pleural plaquing. Additionally, he found that Plaintiff suffers from restrictive breathing which is characteristic of an individual suffering from asbestosis. He admitted that these findings are associated with asbestosis.
25. Dr. Kunstling acknowledged that the reason he cannot say Plaintiff has asbestos is because he did not see any pulmonary fibrosis on a CT scan he reviewed of Plaintiff's lungs. Dr. Kunstling stated that Plaintiff may have some very early asbestosis not appreciable on a CT scan, but a lung biopsy would probably reveal some pathological findings.
26. Dr. Goodman was retained by Defendants to review a series of radiological films. Dr. Goodman agreed that Plaintiff has asbestos-related pleural plaques. Dr. Goodman added that Plaintiff's April 2004 CT scan showed "heterogeneous linear lung opacities" which is one way in which asbestosis might present on a high-resolution CT scan. Dr. Goodman agreed that it was possible that Plaintiff had asbestosis.
27. Dr. Jill Ohar examined Plaintiff on May 30, 2007. Dr. Ohar is board-certified in pulmonary, critical care, and internal medicine. Since 2002, she has been a teaching professor at the Wake Forest School of Medicine. She has published numerous articles relating asbestos lung diseases. Based upon her review of the pulmonary function testing, Dr. Ohar concluded that Plaintiff suffered from a restrictive breathing impairment, which would be characteristic of *Page 9 
someone with asbestosis. Dr. Ohar opined that Mr. Pope suffered from both pulmonary asbestosis and asbestos-related pleural disease.
28. Dr. Umeh's testimony is given greater weight than Dr. Kunstling's testimony. Even if Dr. Ohar's testimony were not considered pursuant to Defendants' objection, the greater weight of the competent evidence showed that Plaintiff contracted asbestosis and asbestos-related pleural plaques.
29. The greater weight of the competent evidence establishes that Plaintiff was exposed to the hazards of asbestosis while employed by Defendant-Employer. The credible testimony from Plaintiff established that he had greater asbestos exposure at Defendant-employer than does the public generally. No evidence was submitted showing that Plaintiff was injuriously exposed to the hazards of asbestosis in any subsequent employment.
30. The Full Commission finds that Plaintiff developed asbestosis as a result of his employment with Defendant-Employer.
31. The greater weight of the competent evidence establishes that Plaintiff stopped working due to breathing problems and that his asbestosis was a significant factor in his breathing problems.
32. The Full Commission finds that the parties were unable to stipulate to Plaintiff's average weekly wages, as defined by N.C. Gen. Stat. § 97-2(5).
33. The first option for calculation of average weekly wages is the "earnings of the injured employee in the employment in which he was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury . . . divided by 52." N.C. Gen. Stat. § 97-2(5). *Page 10 
34. The Full Commission finds that Plaintiff did not work the period of 52 weeks immediately preceding the date of the injury, and a calculation based on the first option would result in Plaintiff receiving no benefits. Consequently, the Full Commission finds that such a result would be unfair and unjust to the Plaintiff.
35. The second option for calculation of average weekly wages is the following:
 if the injured employee lost more than seven consecutive calendar days at one or more times during such period, although not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks remaining after the time so lost has been deducted.
N.C. Gen. Stat. § 97-2(5).
36. The Full Commission finds, again, that Plaintiff did not work the period of 52 weeks immediately preceding the date of injury, regardless of days lost to apply the second option for calculation of average weekly wages, and a calculation based on the second option would result in Plaintiff receiving no benefits. Consequently, the Full Commission finds that such a result would be unfair and unjust to the Plaintiff.
37. The third option for calculation of average weekly wages is the following:
 Where the employment prior to the injury extended over a period of fewer than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will be thereby obtained.
N.C. Gen. Stat. § 97-2(5).
38. The Full Commission finds, again, that Plaintiff did not even work a period of fewer than 52 weeks prior to the injury and a calculation based on the third option would result in Plaintiff receiving no benefits. Consequently, the Full Commission further finds that such a result would be unfair and unjust to the Plaintiff. *Page 11 
39. The fourth option for calculation of average weekly wages is the following:
 Where, by reason of a shortness of time during which the employee has been in the employment of his employer or the casual nature or terms of his employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury was being earned by a person of the same grade and character employed in the same class of employment in the same locality or community.
N.C. Gen. Stat. § 97-2(5).
40. The Full Commission finds that no evidence was presented by the parties regarding the average weekly wage earned by a similarly-situated turkey farmer at the time of Plaintiff's asbestosis diagnosis, and the Full Commission is without sufficient evidence to consider a calculation of average weekly wages based on the fourth option. Consequently, the Full Commission finds that without any evidence, any attempt to determine Plaintiff's average weekly wages would not only be unfair and unjust to Plaintiff and Defendants, but cannot be determined.
41. The Full Commission finds that the utilization of the first four methods for determining average weekly wages enunciated in N.C. Gen. Stat. § 97-2(5) would produce unfair and unjust results. The Full Commission further finds that based on the exceptional reasons and circumstances of the unfair and unjust results, the Full Commission must use such other method of computing average weekly wages that will most nearly approximate the amount which Plaintiff would be earning were it not for the injury.
42. The Full Commission finds that Plaintiff had one sole source of income prior to stopping work due to asbestosis related breathing problems, and that Plaintiff's earnings for the last year that he worked as a turkey farmer approximate the amount that Plaintiff would be earning would it not be for the injury. *Page 12 
43. The Full Commission finds that, based on the exceptional reasons and circumstances of this claim, that Plaintiff's average weekly wages should be calculated based upon earnings of Plaintiff during his last year as a turkey farmer, divided by 52 weeks. The Full Commission further finds that the resulting average weekly wages and compensation rate is fair and just to the Plaintiff and Defendant-employer. The Full Commission further finds that use of Plaintiff's earnings during his last year as a turkey farmer, divided by 52 weeks, most nearly approximates the amount which Plaintiff would be earning were it not for the injury.
44. Plaintiff earned $31,127.00 the last year he worked as a turkey farmer. The average weekly wages for Plaintiff's last year of work is $598.60, which yields a compensation rate of $399.06.
45. The Full Commission finds that Plaintiff's average weekly wages is $598.60, yielding a compensation rate of $399.06
46. Defendants have not defended this case without reasonable grounds.
 ***********
Based on the competent evidence of record, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff was exposed to the hazards of asbestos during his employment with Defendant-employer, which subsequently led to Plaintiff contracting asbestosis. Plaintiff's asbestosis is an occupational disease due to causes and conditions characteristic of and peculiar to his employment with Defendant-employer, and which is not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(24).
2. Plaintiff's asbestosis was a significant contributing factor to his becoming disabled in September 2003. N.C. Gen. Stat. § 97-2(9). *Page 13 
3. The first four methods for calculation of average weekly wages under N.C. Gen. Stat. § 97-2(5) would result in Plaintiff not being entitled to any disability benefits, and such results would be unfair or unjust to Plaintiff. N.C. Gen. Stat. § 97-2(5).
4. It would be ". . . unfair to calculate Plaintiff's benefits based on his income upon the date of diagnosis because he was no longer employed and was not earning an income . . . since the General Assembly has made no specific provision for determining compensation pursuant to N.C. Gen. Stat. § 97-64 when a former employee is diagnosed with asbestosis some time after his removal from the employment, the only statutory provision which may in fairness be used" for calculating average weekly wages for the exceptional reasons and circumstances set forth above is the fifth method found in N.C. Gen. Stat. § 97-2(5). See Abernathy v. SandozChemicals/Clariant Corp.,151 N.C. App. 252, 565 S.E.2d 218 (2002). Due to the exceptional reasons and circumstances, Plaintiff is entitled to compensation at the rate of $399.06 per week for all periods of time he was or is out of work as a result of his work-related occupational disease. N.C. Gen. Stat. §§ 97-2(5), 97-2(9).
5. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's compensable asbestosis for so long as such evaluations, examinations and treatments may reasonably be required to effect a cure, give relief and will tend to lessen the period of Plaintiff's disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following: *Page 14 
 AWARD
1. Subject to attorney fees hereinafter approved, Defendants shall pay total disability benefits in the amount of $399.06 per week beginning September 2003 and continuing until further Order of the Commission. All sums that have accrued shall be paid in one lump sum.
2. Defendant shall pay for all medical expenses incurred or to be incurred by the Plaintiff as a result of the compensable injury when bills for the same have been submitted to and approved by the North Carolina Industrial Commission for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief, and/or lessen Plaintiff's period of disability.
3. A reasonable attorney fee of 25 percent of the compensation due to Plaintiff is approved for Plaintiff's counsel and shall be paid as follows: 25 percent of the lump sum due to Plaintiff under paragraph 1 of this award shall be deducted from that sum and paid directly to Plaintiff's counsel. Thereafter, every fourth compensation check due Plaintiff shall be paid directly to Plaintiff's counsel.
4. Defendants shall pay the cost of this matter.
This the ___ day of July 2011.
 S/__________________________
 PAMELA T. YOUNG
 CHAIR
CONCURRING:
S/___________________________ DANNY LEE McDONALD *Page 15 
COMMISSIONER
S/____________________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1